IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 16, 2019 Session

## STATE OF TENNESSEE v. DARIUS ALEXANDER COX

**Appeal from the Circuit Court for Rutherford County**
**No. F-73443  Royce Taylor, Judge**

_____

### No. M2017-02178-CCA-R3-CD
_____

Defendant, Darius Alexander Cox, was convicted after a jury trial of two counts of especially aggravated kidnapping, two counts of aggravated robbery, and two counts of employing a firearm during a dangerous felony.  After a sentencing hearing, Defendant received a total effective sentence of forty years.  After the denial of his motion for new trial, Defendant appeals and argues that the evidence was insufficient to support his convictions, that the trial court erroneously admitted evidence of other crimes under Tennessee Rule of Evidence 404(b), that the prosecutor made improper comments during closing argument, and that the trial court erred by imposing consecutive sentences.  After a thorough review, we conclude that the trial court committed reversible error by admitting evidence of Defendant's other crimes because the evidence was not relevant to a material issue other than Defendant's character.  Accordingly, we reverse the judgments of the trial court and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Reversed and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT L. HOLLOWAY, JR., JJ., joined.

Patrick T. McNally, Nashville, Tennessee, for the appellant, Darius Alexander Cox.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and John C. Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Rutherford County grand jury indicted Defendant for two counts of especially aggravated kidnapping, two counts of aggravated robbery, one count of conspiracy to commit aggravated robbery, one count of possession of a firearm by a felon, and two counts of employing a firearm during a dangerous felony. The indictment was later amended to remove the charges of conspiracy to commit aggravated robbery and possession of a firearm by a felon. The following facts were adduced at the trial on these charges.

Shameka Johnson lived in La Vergne, Tennessee, with her husband Carl Waldon. On March 14, 2014, Amanda Landrum, a social worker for Rutherford County Schools, went to Ms. Johnson's house and met with Ms. Johnson to help her with school paperwork for her child. Ms. Landrum arrived around 12:58 p.m. About ten minutes into Ms. Landrum's visit, someone loudly knocked on the door. Ms. Johnson cracked the door and inquired, "Who's there?" A man responded, "My car is broke down, I need some water." She responded, "Who is it?" No response was given. Ms. Johnson "brushed it off" and told them to "go on." After closing the windowless door, Ms. Johnson went upstairs to look out a window on the front of the house. Ms. Landrum looked out a window on the back of the house to see if "anything fishy was going on." Neither saw anything. They continued their meeting for about an hour. When Ms. Johnson opened the door for Ms. Landrum to exit, two men forced their way inside and pointed guns at the victims. One of the men was "taller," "light skinned," and had "braided hair." The "light skinned" man had markings on his face. The other man was "shorter," "dark skinned," and had "shorter hair." The men told the victims to "get [their] f**king a**es back into the house" and "not to look at [the men]." The men shoved the victims into the foyer of the house and took their cell phones and car keys. The "light skinned" man told Ms. Landrum to remove her coat. When Ms. Landrum removed her coat, she looked directly at the face of the "light skinned" man.

The "light skinned" man went upstairs and rummaged through the house while the "dark skinned" man held a gun on the victims. Ms. Landrum believed that the men were looking for something particular. The "light skinned" man kept shouting phrases like, "where's it at?"; "I can't find it."; "What are we looking for?"; and "You know, I know it's here." The two men were yelling at each other, and the "dark skinned" man asked Ms. Johnson, "Where is he at?" Ms. Johnson replied, "No." He asked, "Who's here?" She replied, "Nobody's here. Nobody else is here." He asked again, "Where is he at?" She responded, "Who? My husband?" He said, "Yes." "He's gone," she answered. He retorted, "When is he coming back?" She replied, "I don't know, maybe an hour or so." He specifically asked, "Where's the money?" "I don't know," she responded. Pressing, he inquired, "You know where the money is, where is it?" Again she said, "I don't know." Ms. Landrum heard Ms. Johnson say that "[her husband] doesn't do that kind of stuff any more [sic]." After a while, the men exchanged roles and may have swapped control of the gun.

When both men left the victims' presence for a moment, Ms. Landrum asked Ms. Johnson, "Do you think we should run?" Ms. Johnson said, "No." One of the men overheard them talking and told them, "If you leave I'm gonna pop you. If you try to run I'm gonna pop you." The "light skinned" man, now armed with a gun, forced the victims into a bathroom and secured the door with a chair. The "light skinned" man said that if they made a "f**king sound," the men would "pop" the victims in the head. After confining the victims to the bathroom and securing the door with a chair, the men continued to rummage through the house. Eventually, one man asked the victims whose car had more fuel in it. After that inquiry, the victims waited in the bathroom about fifteen minutes before running to a neighbor's house and calling the police. Throughout this entire course of events, Ms. Johnson held her infant child. Ms. Johnson admitted that she was not focused on the looking at the men. She focused on protecting her infant child and only briefly saw the men's faces.

The men took Ms. Johnson's wedding ring, Mr. Waldon's wedding ring, a laptop, a camera, a tablet, all of Ms. Johnson's jewelry, Mr. Waldon's payroll check, two or three cellphones, and a pair of tennis shoes. Ms. Landrum recalled that the men took her cell phone, her car, her purse, her work bag, and everything else that was in her car.

After the police arrived, Ms. Landrum spoke with Officer Anne Thompson separately from Ms. Johnson. Both victims told Officer Thompson that the men who perpetrated the crime were approximately 5' 9" in height, but neither victim recorded this information in her written statement. With regard to the age of the men, the victim said that they were in "their late-teens, maybe early-20s." Officer Thompson recalled a description of the "light-skin man" as having "short braids," having "scars on his face," and wearing "what could be described as Converse sneakers." Officer Thompson asked the victims to write down the events that had occurred. At trial, Ms. Landrum could not recall telling Officer Thompson many defining features of the men who robbed her, but she did recall telling Officer Thompson that one of the men was "light skinned" and the other was "dark skinned." When further pressed on cross-examination, Ms. Landrum remembered telling Officer Thompson that the "light skinned" man had marks on his face. She recalled that the marks were darker in color than the man's skin tone and were on his cheeks. She also described the "light skinned" man as having "circles under his eyes" and hair "in braids." Ultimately, Ms. Landrum admitted "I honestly don't remember the conversation I had with [Officer] Thompson. . . . There was so much chaos going on, I don't know what I said to who at that point. So, I don't know what I said to her." At trial, Ms. Johnson could not remember telling the officer a description of the men.

Subsequent to the occurrence at Ms. Johnson's house, Detective Neal Wolf of the Metro Nashville Police Department responded to call regarding a string of three

burglaries around the Apple Valley neighborhood in Davidson County. When Detective Wolf arrived, Defendant had already been arrested, and Detective Wolf took possession of Defendant from the other officers on the scene. Detective Wolf searched Defendant, and Detective Wolf searched what he assumed to be Defendant's wallet that was lying on the top of a car at the scene. That wallet contained a payroll check for "432 dollars" made out to "Carl Waldon." This intrigued Detective Wolf because the check was not made out to Defendant or the other individual that was arrested alongside Defendant. Detective Wolf found property from other burglaries in Defendant's car. Detective Wolf turned over the check and the other stolen property to another detective. Eventually, the check was sent to the La Vergne Police Department.

On cross-examination, Detective Wolf admitted that he "believed" the wallet was removed from Defendant's pocket and placed on top of the car. However, Detective Wolf could not recall removing the wallet from Defendant's pocket, nor did Detective Wolf witness another officer removing the wallet. Additionally, Detective Wolf could not remember if the wallet contained any forms of identification.

Detective Stephen Hale of the La Vergne Police Department received word from the Metro Nashville Police Department that "they had made an arrest on some individuals that had been breaking into some homes down in Antioch. One of those individuals had a check that was taken from the residence of [Ms. Johnson.]" Detective Hale was informed that the check was found in a wallet possessed by Defendant.

Detective Hale retrieved a picture of Defendant from the criminal justice portal and used that picture in a photographic lineup that he presented to the victims. Detective Hale had each victim review the photographic lineup individually. He instructed each victim that the individual who committed the crime "may or may not be in there." He supplied each victim with the photographic lineup and told them "if they see the person they believed to have committed the crime, to sign and date it underneath." Detective Hale surreptitiously recorded both victims as they viewed the photographic lineup. Detective Hale met with Ms. Landrum in a conference room at the police station. Ms. Landrum's husband and two other police officers were also present. The two other police officers would not make eye contact with Ms. Landrum, and she described it as an "intimidating environment." Ms. Landrum recalled "looking for some kind of support from them," but "[t]hey were giving me nothing." Detective Hale showed Ms. Landrum about three pages of black and white photographs. Detective Hale instructed her to take her time while looking at every picture. From the photographic lineup, Ms. Landrum could not be 100 percent certain, but she "ninety-five percent sure" or "ninety percent sure" that Defendant as the "light skinned" man. Ms. Landrum identified Defendant by signing beneath his picture. At trial she remarked, "[I]t would have been nice to have seen those in color. It's just hard to identify anyone from a picture. His hair was a little bit different." Ms. Landrum said, "I was doubting myself as far as I didn't, you know,

feel extremely confident, because I wasn't getting the support." However, Ms. Landrum also identified Defendant in the courtroom at trial. Ms. Landrum described the differences in the appearance of the "light skinned" man during the robbery, the appearance of Defendant in the picture, and the appearance of Defendant in the courtroom by stating, "During the robbery, he looked more like he does today than his picture, as far as his hair goes. Same thing with the beard, looks fuller there. It wasn't that full during the robbery. It's hard to tell with the shadows on his neck, in the photograph." When asked about his appearance on the day of the robbery compared to his appearance at trial, Ms. Landrum said, "His appearance is almost identical. . . . I feel 100 percent certain that that's who it is."

Ms. Johnson also viewed a photographic lineup. While she pointed to a picture, she would not sign her identification because she could not be certain that the identification was 100 percent correct. She said, "The picture looks really different than the guy." At trial, the prosecutor asked Ms. Johnson, "If you saw the light skin man in court today, would you be able to recognize him?" She responded, "Not a hundred percent." However, she did say that Defendant "looks like" one of the two men that came into her home. She added the caveat, "I don't remember the guy being that tall."

Ms. Johnson is five feet, nine inches tall. She perceived both men to be "the same height" and around "5'9, 5'10." She thought that they were both near average height and did not remember one being particularly tall. Ms. Johnson also admitted that she thought the "light skinned" man had markings on his face. However, she remarked that the "light skinned" man's hair was similar to Defendant's at trial. She also mentioned that the "light skinned" man "could have been tall," but she "didn't get a good look." Defense counsel asked Ms. Johnson, "[Y]ou don't know if [Defendant is] the person who robbed your or not?" She responded, "No, I don't."

During cross-examination at trial, Detective Hale read aloud an email that he had sent to the prosecutor stating,

> The answer to your first question is yes, there were two sets of photo-lineups of both suspects . . . . Both victims were presented each photo-lineup, neither victim identified the charged partner of [Defendant]. Answer to your second question is yes, meaning [Ms. Johnson] did not identify [Defendant]. [Ms.] Landrum did not, 100 percent, identify [Defendant], but gravitated around him quite a bit. She said he looked really familiar, but cannot say, without a doubt, that it was him. I did not have her sign-off on a lineup of [Defendant], because of the uncertainty she displayed.

Detective Hale clarified that he advised Ms. Landrum not to sign the photographic lineup if she was unsure but told her, "if she felt comfortable," then "she could sign-off on it." Ms. Landrum eventually signed the photographic lineup "on her own."

After Ms. Landrum identified Defendant in the photographic lineup, Detective Hale took out warrants against Defendant. While serving the warrants on Defendant at the jail in Davidson County, Detective Hale gave Defendant a *Miranda* warning, and Defendant agreed to speak with him. The only information that Defendant told Detective Hale was that Defendant "had a brother that could pass as his twin, and that it could have been him." Detective Hale determined Defendant did not have a biological brother.

As part of the defense proof, Brian Cox, Defendant's father, testified that Defendant is six feet and five inches tall and wears a size 14 shoe. Mr. Cox estimated that the last time Defendant got a haircut was when Defendant was around sixteen or seventeen years old in either 2004 or 2005. Defendant wore his hair in long dreadlocks, and Defendant's hair style had not changed in a substantial manner between 2014 and the time of trial. Mr. Cox explained that Defendant had a tattoo of his daughter's name on his right hand. Mr. Cox also stated that Defendant did not have acne scars on his face and that Defendant had kept a beard and mustache since he was around nineteen or twenty years old. Mr. Cox had only ever known Defendant to wear Jordan or Nike sneakers, never Converse.

According to Mr. Cox, a man named Jonathan Corke, Defendant's close friend, could be mistaken for Defendant. Both men wore the same hair style. Mr. Cox described Mr. Corke as "a little bit shorter" than Defendant with "light skin" and a "slender build." Mr. Cox recalled Defendant and Mr. Corke calling each other "brothers." Mr. Corke died during a home invasion sometime after he and Defendant were arrested for the Nashville burglaries.

The jury found Defendant guilty as charged. The trial court sentenced Defendant to concurrent twenty-two-year sentences for especially aggravated kidnapping in Counts One and Two, and concurrent eighteen-year sentences for aggravated robbery in Counts Three and Four, which were to run consecutively to the sentence in Counts One and Two. The trial court merged Defendant's convictions for employment of a firearm during a dangerous felony in Counts Six and Seven with Counts One and Two, respectively. The trial court sentenced Defendant to a total effective sentence of forty years. Subsequently, Defendant filed a motion for new trial arguing that the evidence was insufficient to support his convictions and that the trial court erred by allowing testimony regarding Defendant's subsequent arrest for three counts of aggravated burglary in Davidson County. The trial court denied Defendant's motion for new trial, and this appeal followed.

*Analysis*

*I. Sufficiency of the Evidence*

Defendant challenges the sufficiency of the proof relating to his identification as one of the perpetrators in this case. Defendant essentially concedes that all of the requisite elements from the applicable statutes have been met and says the "only question" is whether Defendant was one of the perpetrators. The State contends that the identification of Defendant as one of the perpetrators in this case has been proven beyond a reasonable doubt. We agree with the State.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court considers all of the evidence presented at trial, even if Defendant challenges the admissibility of some of the evidence on appeal. *See State v. Thomas Bolton*, No. W2012-02000-CCA-R3-CD, 2014 WL 12653829, at *10 (Tenn. Crim. App. Jan. 31, 2014) (citing *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)), *no perm. app. filed*. Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). If a witness viewed the perpetrator under circumstances which would permit a positive identification to be made, "the credible testimony of one identification witness is sufficient to support a conviction." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). "Inconsistency, inaccuracy and

omissions in the description of a defendant by a witness who is otherwise able to positively identify the defendant are questions for the jury to consider in determining the weight to be given the testimony." *Id.* While inconsistency or inaccuracy in a witness's identification may lessen the credibility of the witness, we will not disturb the jury's verdict unless the inconsistency or inaccuracy is "so improbable or unsatisfactory as to create a reasonable doubt" of the defendant's guilt. *Id.*

At trial, Ms. Landrum identified Defendant as one of the perpetrators. Ms. Landrum affirmed her in-court identification by saying she felt "100 percent certain" that Defendant was one of the perpetrators, and Ms. Landrum articulated the minor differences between Defendant's appearance during the robbery and at trial. This in-court identification is supported by Ms. Landrum's identification of Defendant in a photographic lineup of which she was ninety to ninety-five percent certain. Ms. Johnson testified that Defendant looked like one of the perpetrators. Additionally, Detective Wolf testified the he recovered a check addressed to "Carl Waldon" from a wallet that was found during the investigation of Defendant for three burglaries in Davidson County. The check directly links Defendant to the crime at Ms. Johnson's house. The weighing of prior descriptions of the perpetrators against the in-court identification of Defendant is a task for the jury. We discern no improbable or unsatisfactory inconsistencies or inaccuracies in the identification of Defendant that would give rise to a reasonable doubt. Therefore, the evidence of Defendant's identity as one of the perpetrators is sufficient.

## II. Improper Character Evidence

Defendant contends that the trial court erred by admitting evidence of Defendant's involvement in three burglaries in Davidson County. Specifically, Defendant argues that the probative value of the nature of the crimes for which Detective Wolf was investigating Defendant when the check to Carl Waldon was recovered is outweighed by the unfair prejudice to Defendant and that the trial court did not conduct a proper analysis balancing the probative value of the evidence against the danger of unfair prejudice. The State responds that "[t]he trial court did not abuse its discretion in determining that the probative value of informing the jury of the circumstances of the check's recovery was not outweighed by the danger of unfair prejudice."

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, it may be inadmissible. Tenn. R. Evid. 403. However, "[e]vidence of other crimes, wrongs, or acts" is inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait." Tenn. R. Evid. 404(b); *State v. Parton*, 694 S.W.2d 299, 654 (Tenn. 1997). "The terms of this rule establish that character evidence cannot

- 8 -

be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994)). Yet, such evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme" or "contextual background." *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013). Other act evidence may be admitted for these purposes only after the following requirements have been met:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). However, "[t]rial courts have been encouraged to take a restrictive approach of Rule 404(b) because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (internal quotation and citation omitted).

A trial court's decision to admit or exclude evidence under Rule 404(b) is reviewed under an abuse of discretion standard if the trial court has substantially complied with the procedure mandated by the Rule. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Where the trial court has failed to substantially comply with the procedural dictates of Rule 404(b), the standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-653)). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party." *Jones*, 450 S.W.3d at 892 (internal quotation and citation omitted).

A jury-out hearing was held to determine the admissibility of evidence pursuant to Tennessee Rule of Evidence 404(b) at trial. The State offered into evidence three judgment documents reflecting that Defendant had pled guilty to aggravated burglary for burglaries that led to his arrest in Davidson County. The State argued that their intention

was to offer the testimony of Defendant Wolf and the judgments for aggravated burglary as proof of Defendant's identity and Defendant's motive for breaking into Ms. Johnson's house. When describing the motive, the State said, "[H]e was needing money, and within 10 days later, he's also trying to rob and steal again."

Defense counsel suggested, "The witness should be instructed that he may testify that on March the 24th, he came into contact with [Defendant] and that he inventoried [Defendant's] property, and that in [Defendant's] wallet, he found a check. That does not prejudice [Defendant], unduly." Defense counsel argued further that the introduction of evidence relating to crimes very similar to those of which Defendant stood accused would pose an "enormous" danger of unfair prejudice that "effectively, denies [Defendant] the right to a fair trial."

The State shifted its argument and responded as follows:

> Well, obviously, they want to narrow it as much as possible, so that the jury will be left to wonder, well, how in the world did he become in possession of it? Did he take his - - Did he do a field interview after church one day? Did he find him in a shopping center? Was he harassing the defendant, and demanding that he produce the billfold and find the check in it? Could the check have gotten there by legitimate means? But showing [the] check was in his possession at the time he's robbing other homes, shows that the [D]efendant is keeping some of the booty from the prior robbery, has it on him as he commits other robberies, and it shows why he's in need of money. He didn't get any money in this place. He's looking for more money.

After references to some different scenarios in other cases, the prosecutor asserted, "I want them to understand that it was pursuant to a lawful investigation. The [D]efendant was lawfully arrested and he committed these crimes, and the police had a lawful reason for seizing his billfold and searching it."

After both parties completed their arguments, the trial court determined that there was a material issue, other than the Defendant's character, for which the evidence was being offered. When specifying the material issue, the trial court said:

> I think the material issue is that, we need to have the complete story here with regard to this, to complete the basis for the introduction of the check that allows the jury to determine that these are connected in some way. And that, there was a check found at these other crimes. And that, they're necessary to show the complete story of how that check is related in the other crimes to this crime.

- 10 -

The trial court stated, "Obviously, this check [is] relevant [and the] circumstances under which it was found [are] relevant." The trial court found that there was clear and convincing evidence that Defendant was involved in other crimes, and said, "[I]t appears that the probative value then, clearly outweighs the unfair prejudice in this case." In so doing, the trial court substantially complied with the procedural dictates of Rule 404(b), and thus, our review is for an abuse of discretion.

On appeal, both Defendant and the State point us to *State v. Edward Sample*, No. W2014-01583-CCA-R3-CD, 2015 WL 6165159 (Tenn. Crim. App. Oct. 21, 2015), *no perm. app. filed*, as the measuring stick for the admissibility of the evidence in this case. In *Edward Sample*, a man robbed the victims at gunpoint and fired his gun in the process. *Id.* at *2. The shell casing ejected from the man's handgun struck one of the victims and landed inside the car in which the victims were sitting. *Id.* A latent fingerprint was recovered from the car. *Id.* Neither victim was able to make an out-of-court or an in-court identification of the defendant; however, both victims were shown a purple skull cap that belonged to the defendant, and both remarked that it was similar to the one worn by the man who robbed them. *Id.* A few weeks later, the defendant conducted an armed carjacking and engaged in a shootout with a police officer. *Id.* at *4. The shell casings from the defendant's gun at the shootout were consistent with the shell casing from the robbery of the victims that occurred weeks earlier. *Id.* at *5. Additionally, the latent fingerprint recovered from the car matched the defendant. *Id.* at *5. Unlike the present case, the State conceded that testimony regarding the shootout with the officer was inadmissible in *Edward Sample*. *Id.* at *6. Also, the trial court in *Edward Sample* failed to weigh the probative value of the evidence against the danger of unfair prejudice, and thus, this Court conducted a de novo review. *Id.* at *7. This Court determined that probative value of the evidence was outweighed by the danger of unfair prejudice because the defendant's identity was the material issue at trial and "only the testimony regarding the physical evidence and its recovery at the scene was probative of the defendant's identity." *Id.* This Court also said that the "detailed information" about the nature of the other crimes did nothing to establish the defendant's identity. *Id.* This Court ruled that the physical evidence from the subsequent crime was admissible, but the testimony about the nature of the subsequent crime was not admissible. *Id.* at *8. Additionally, this Court held that the error was not harmless because the State focused on the evidence and the evidence "'freed the jury to conclude more comfortably'" that the defendant committed the crimes in that case. *Id.* (citing *Rodriguez*, 254 S.W.3d 361, 377 (Tenn. 2008)).

In one regard, this case differs from *Edward Sample*. The material issue identified in *Edward Sample* was that of identity. To the contrary, the trial court in this case identified the material issue as the need for a "complete story."

[W]hen the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

*State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000). "Crimes introduced to tell the 'complete story' will rarely be probative of a fact in issue in the trial of the crime charged and, therefore, rarely justify the prejudice created by their admission." Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence, § 4.04[13] (6th ed. 2011). Crimes admitted to tell the "complete story" should be only those "so inextricably connected in time, place, or manner" that the jury would be baffled by the charged crime without hearing the evidence of the other crime. *Id.*

The trial court in this case made no explicit finding about whether the absence of evidence regarding the nature of the crime for which Detective Wolf investigated Defendant would create a "chronological or conceptual void" in the State's case, nor did the trial court explicitly find that a void would likely result in "jury confusion." It would be impossible to make these findings because there was no need to reveal the nature of the crimes Detective Wolf was investigating when he found the check. No void or confusion would have resulted from completely omitting from trial the evidence pertaining to the nature of the Davidson County crimes. Like in *Edward Sample*, the only evidence that was relevant was the physical evidence recovered—in this case, the check—not the circumstances surrounding its recovery. Therefore, the evidence does not relate to a material issue other than Defendant's character. Any testimony from Detective Wolf mentioning the subsequent burglaries was unnecessary and inadmissible, and the trial court abused its discretion by admitting such evidence.

To be clear, the evidence that the check was recovered in Defendant's possession was relevant and properly admissible. The evidence surrounding the circumstances of the check's recovery in Davidson County was so prejudicial to Defendant that it outweighed its probative value and thus was improperly admitted.

In another regard, this case is similar to *Edward Sample*. While the amount of detail about the subsequent crime and the State's focus on the subsequent crime was far less in this case, the evidence that Defendant was involved in a string of subsequent burglaries had the same effect as the evidence of other crimes in *Edward Sample*. We review errors in evidentiary rulings under a harmless error standard, which requires the defendant to prove that the error "more probably than not affected the judgment or would

result in prejudice to the judicial process" when the entire record is considered. *State v. Clark*, 452 S.W.3d 268, 287-88 (Tenn. 2014); Tenn. R. App. P. 36(b). "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affect the outcome of the trial." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008). In this case, the evidence of Defendant's identity, though legally sufficient, was not insurmountable. The pre-trial descriptions of the perpetrator said that he was five feet, nine inches tall with short braided hair and scars on his face. Defendant is six feet, five inches tall with long dreadlocks and no scars. The photographic lineups were less than one hundred percent conclusive, and only Ms. Landrum was one hundred percent sure of her identification at trial. In our review of the record, the prejudicial effect of Defendant's involvement in subsequent burglaries blurred the jury's view of the weak evidence of Defendant's identity. Like we held in *Edward Sample*, we hold that the admission of this evidence probably affected the jury's verdict. Thus, the error is not harmless.

On remand we envision Detective Wolf's testimony being limited to a statement that he was conducting a lawful investigation of Defendant and that during that investigation, he recovered a wallet believed to belong to Defendant. Detective Wolf may then describe the details of the check, but he should not mention that the check was placed with the evidence from the other burglaries.

### III. *Improper Prosecutorial Argument*

While Defendant's claim that the prosecutor engaged in improper argument is rendered moot by our decision to reverse the judgments against him and grant him a new trial, we will address the improper prosecutorial argument issue for guidance on remand or in case of further appellate review. Defendant claims that the prosecutor made an improper argument when he commented that Defendant's father did not present an alibi for Defendant. The State points out that Defendant failed to object and did not request plain error review, and the State argues that the prosecutor's comments were permissible. We conclude Defendant is not entitled to plain error relief.

Our supreme court has stated "that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument." *State v. Jordan*, 325 S.W.3d 1, 57 (Tenn. 2010). A timely objection gives the trial court the opportunity to assess the State's argument and to take appropriate curative action. *Id.* at 57-58. Failure to contemporaneously object constitutes a waiver of the issue on appeal. *Id.* When an issue is waived, we are limited to plain error review. *Id.* Our supreme court has succinctly described the discretionary nature of the plain error doctrine as follows:

In criminal cases, the doctrine of plain error permits appellate courts to consider issues that were not raised in the trial court. [Tennessee Rule of Appellate Procedure] 36(b), the codification of the plain error doctrine, states in part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We have cautioned, however, that the discretionary authority to invoke the plain error doctrine should be "sparingly exercised," *State v. Bledsoe*, 226 S.W.3d [349,] 354 [(Tenn. 2007)], because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them." *State v. Northern*, 262 S.W.3d [741,] 766 [(Tenn. 2008)] (Holder, J., concurring and dissenting) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).

*State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014). To determine whether a trial error rises to the level of justifying "plain error" review, we look to the following five factors:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Bishop*, 431 S.W.3d at 44. Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642).

Defendant's brief contains no mention of plain error analysis, and he does not expressly address any of the plain error factors. Defendant bears the burden of persuading this Court that the trial court committed plain error and that the error probably changed the outcome of the trial. *See State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016). We refuse to entertain a plain error analysis because Defendant has failed to show that the issue was not waived for tactical reasons. In his brief, Defendant does not explain why no objection was lodged. This Court can contemplate multiple tactical reasons that would explain why defense counsel may have consciously chosen not to object to the prosecutor's closing argument, and none of those reasons were dispelled in Defendant's brief. Therefore, Defendant has not carried his burden of persuasion.

*IV. Consecutive Sentencing*

Defendant's argument pertaining to his consecutive sentencing is also rendered moot by our decision to reverse the judgments against him and grant him a new trial. However, like the issue above, we will address the consecutive sentencing issue for guidance on remand or in case of further appellate review. Defendant argues that the trial court erred by imposing consecutive sentences. Specifically, Defendant contends that the trial court did not properly provide the reasons for imposing consecutive sentencing on the record. The State argues that the trial court's adoption of the State's sentencing memorandum and the trial court's "implicit" findings indicate that the trial court did not abuse its discretion. Though we cannot afford the trial court a presumption of reasonableness, we conclude that the trial court did not err by imposing consecutive sentences.

Generally, we review the imposition of consecutive sentencing using an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). However, the trial court is only afforded a presumption of reasonableness "if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Id.* at 861. To impose a consecutive sentence, a trial court must find one of the following grounds by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and

victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). "Any one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard*, S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)).

At the sentencing hearing, the trial court addressed consecutive sentencing for the convictions in this case by saying, "The [c]ourt . . . adopts the consecutive sentencing reasons that are set forth in the State's memorandum." The State's memorandum recites the language of grounds (1) and (2) from the statute without any application of the facts from the sentencing hearing to those factors. The State argues that the trial court "implicitly found" several facts were applicable to the consecutive sentencing grounds. Implicit findings will not suffice. *See* Tenn. R. Crim. P. 32(c)(1) (stating "[t]he order [for consecutive sentences] shall specify the reasons for this decision"). Without any application of the facts of this case to the grounds listed in the statute, we cannot hold that the trial court sufficiently "provided *reasons* on the record" establishing one of the grounds from the statute. Thus, the trial court's decision is not afforded a presumption of reasonableness, and we will conduct a de novo review of Defendant's consecutive sentencing. *See Pollard*, 432 S.W.3d at 863-64 (stating that the appellate court may "conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences" when the trial court failed to provide adequate reasons for imposing consecutive sentences).

The pre-sentence report, which was admitted as an exhibit during the sentencing hearing, illustrates that Defendant began his life of crime at age eighteen and continued to commit crimes throughout his life, incurring criminal convictions at ages eighteen, nineteen, twenty, and twenty-six. At the time that the pre-sentence report was compiled for the sentencing hearing, Defendant was age twenty-nine. Defendant had twelve prior felony convictions and most of those convictions were for aggravated burglary or burglary. Additionally, Defendant had a prior conviction for misdemeanor theft. Though Mr. Cox testified at the sentencing hearing that Defendant had held various jobs throughout his life, the most consistent theme in Defendant's life appears to be his penchant for stealing the belongings of others, sometimes forcibly. The evidence at the sentencing hearing establishes by a preponderance of the evidence that Defendant's

criminal history is extensive and that Defendant is a professional criminal who has devoted his life to criminal acts as a major source of livelihood. *See* T.C.A. § 40-35-115(b)(1), (2). Thus, consecutive sentencing is warranted for Defendant's convictions.

Though the trial court did not sufficiently state its reasons for imposing consecutive sentences on the record, its decision to impose consecutive sentences was proper nonetheless. However, we must point out that the trial court did not properly fill out the uniform judgment documents with respect to Counts Six and Seven. If these judgments remain in place because this decision is reversed or Defendant is convicted for the same offenses again, the trial court should impose a sentence and properly indicate it on the uniform judgment documents in accordance with *State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015).

*Conclusion*

For the aforementioned reasons, the judgments of the trial court are reversed and the case is remanded for a new trial.

_____
TIMOTHY L. EASTER, JUDGE